## Case No. 205.

### The ALLEGHANY.

[2 Biss. 29.][1]

Circuit Court, E. D. Wisconsin. Sept., 1868.[2]

PROPELLER ENTERING HARBOR.

1. A propeller, entering a harbor, having accepted the signal of an approaching tug and tow to keep to starboard, should, if for any reason it cannot do so, slacken speed.

2. It is not the duty of the tug to stop, as her tow would then become unmanageable.

3. Six miles an hour is too high a rate of speed in Milwaukee harbor, when the vessel does not mind her helm.

4. Testimony of passengers commented upon.

[See The Daniel Drew, Case No. 3,565; The Syracuse, 9 Wall. (76 U. S.) 672; The Leo, Case No. 8,250.]

[See note at end of case.]

[Appeal from the District Court of the United States for the District of Wisconsin.]

[In admiralty. Libel for collision. Decree in district court for libellants. Respondent appeals. Decree affirmed, and decree of circuit court affirmed by supreme court.]

This was an appeal from a decree of the district court against the propeller Alleghany for the loss of a cargo of oats shipped by the libellant, Bernard Goldsmith, on board the schooner Henry C. Winslow, which was sunk by collision with the Alleghany. The facts are fully stated in the case in the district court. 1 Biss. 497, [The Alleghany, Case No. 204.]

Emmons & Van Dyke for libellant, cited The Marcellus, 1 Black, [66 U. S.] 414; The Wa-

[1][Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

[2][Affirming decree of district court in The Alleghany, Case No. 204. Decree of circuit court affirmed by supreme court. 9 Wall. (76 U. S.) 522.]

ter Witch, Id. 494; The Potomac, 2 Black, [67 U. S.] 581: Newell v. Norton, 3 Wall. [70 U. S.] 258; The Grace Girdler, 7 Wall. [74 U. S.] 196.

E. Mariner, for respondent.

DAVIS, Circuit Justice. This case was at the last term argued with great ability and earnestness, but for want of time to consider it, was not decided. I have recently read the evidence and briefs with care and examined the authorities referred to, and am prepared to announce the conclusion at which I have arrived. The testimony is, in a large degree, conflicting, and in many respects irreconcilable, but there are certain leading facts established, as I think, clearly by the evidence, on which, in my opinion, the case turns. The tug Muir left her dock in the harbor of Milwaukee about 7 o'clock on the morning of the 4th of May, 1864, with the schooner Winslow in tow for the purpose of towing her out into the lake. The propeller Alleghany was near the mouth of the straight cut, making for the harbor, and being seen by the tug, was signalled to keep to the right, which signal was accepted. It is uncertain at what point in the river the tug sounded her first whistle, but it is not material, as the notice which the signal gave to the propeller, was in proper time. The tug and tow proceeded down towards the lake, and the propeller up the straight cut, until she struck the schooner in her port side, cutting down several feet below her water line so that she sunk within fifteen minutes. There can be no dispute that this collision was inexcusable, for it occurred on a bright clear day, with nothing to obstruct the view of the approaching vessels, the peculiarities of the navigation well known, and the wind not unfavorable. The important subject of inquiry is to ascertain who is to blame for it. In order to do this, it is not only necessary to consider the conduct and condition of the boats, but also whether the passage up and down the river and cut was beset with difficulties which all mariners accustomed to the port were presumed to know. The evidence shows where the Milwaukee river empties into the straight cut is a difficult point of navigation, difficult for even ascending boats to get the right turn into the river, and requiring a tug towing a vessel out into the lake to use care and skill to get the vessel properly straightened up between the piers. There is also near the inner end of the north pier shoal water, which causes heavily loaded vessels with large draught to sheer off if they go too near it. In the view I take of this case, it is not necessary to determine the exact place where the collision took place. The evidence leaves it uncertain—it is strange that it is so, with so many persons witnessing it—but if not at the entrance of the piers, it was not far inside of them, and at all events the tow was not fairly

straightened up in the cut when it happened. Did the captain of the propeller do all he could under the circumstances to avoid this collision? I think not—he knew he had to take the starboard side of the channel, and yet the answer says he kept only as far over to the starboard as he was able and not go aground, and that in proceeding as far as he did to starboard, his boat dragged the bottom, so that she would not mind her helm, and the evidence sustains the allegation of the answer that she would not mind her helm. Did not these considerations point out to the captain his clear line of duty? Having accepted the signal of the tug to go to the right of the channel, if, for any cause, he found himself unable to do so, he should have waited until the tug and tow passed. Pursuing the center of the channel was certainly not taking the starboard side of it, and going ahead at all after these warnings was experimenting in the face of danger. Besides, the tug had the right to full half the channel. The necessity for haste is not apparent, and it will be conceded that a good seaman would always act as if apprehensive of danger when meeting a tug and tow in a place no wider than the straight cut of the Milwaukee river, and with similar difficulties of navigation.

It is said, it was as much the duty of the tug to have stopped as it was of the propeller. I do not think so. The propeller could stop at any time and reverse, while the tug could not without throwing the schooner around. If the critical point of navigation and the shoal water were equally known to both, yet the master of the propeller knew, better than the master of the tug, the unmanageable condition of his boat and the reasons for it. The tug could not know why the propeller was not under control, and had a right to presume that no boat liable to sheer because of too great draught of water would venture the ascent of the cut with a tug and tow approaching, when a detention of two minutes at the farthest would relieve her of all trouble. The tug having signalled that she would keep to the south, it was her duty to do so, and if she had altered her course for any reason, she would have been properly chargeable in case of collision. As she could not stop without turning the schooner around, it was her duty to go ahead. The dangers of collision are greater in narrow rivers than in the open lake because vessels, in times of peril, cannot be so readily manoevered in the river, and the interests of commerce imperatively require that all boats propelled by steam, in entering a harbor, should check down their speed so as to be under easy control. The Alleghany was in fault in not doing this. Some of the witnesses testify that four miles an hour is the usual rate of speed with which steam vessels enter the Milwaukee harbor, and that they can steer better while running at that rate than if the speed is less or greater. It is certain the Alleghany entered the cut running much faster—how fast it is not easy to tell, but the speed was not less than six miles an hour, and probably higher. Whatever the exact rate of speed, it was too fast, as is proved by her bad steering and inability to mind her helm. It would seem that the master, in his hurry to reach her dock, did not appreciate the responsibility of his position, nor apprehend danger until it was too late. If he misapprehended the speed of his boat or its effect before he entered the cut, as soon as he entered and saw she sheered badly, it was his duty to have checked down to a point that would have enabled him to have readily stopped her when he found difficulty in going to the starboard of the center of the channel. It is true, the engines of the propeller were reversed before the collision, but it was then too late, for the movement did not succeed in stopping, in time, the headway of the boat. That the propeller was in considerable motion at the moment of collision is demonstrated by the character of the injury which the Winslow suffered. The fault was in not doing sooner what was left undone until the peril was imminent. I do not interpret the evidence so as to charge the tug or tow with fault. It is said they did not keep to the south of the channel, but the evidence which has weight with me, proves the contrary.

It is proper to state that I place slender reliance upon the testimony of the passengers on board the Alleghany who swear she was nearer the north than the south pier when the vessels collided. They mean to tell the truth, but I distrust very much their ability to judge of courses and distances on an element to which they are not accustomed, and this distrust is increased when I find they are contradicted by the weight of the remaining evidence in the case. Besides there are too many of them who swear too nearly alike. It is insisted the tug and tow could with safety to themselves have gone further south. This may or may not be true, but if true, it was not a fault, for they left plenty of room to the north for any vessel that would mind her helm and would not sheer, and they were not required to go further south to accommodate a vessel in the predicament of the Alleghany. The decree of the court below is affirmed.

[NOTE. This decree was affirmed by the supreme court. Mr. Justice Strong, in delivering the opinion, reviewed the facts involved, and remarked that, as the master of the propeller knew the difficulties of the channel, it was "his duty to avoid the meeting in that part of the cut where the propeller could not go to the north side, and to make no attempt to pass until the tug could straighten out her tow. He had it in his power to select the place for passing. If it be, as is now contended, that the propeller could not at that part of the cut go

nearer the north pier, in consequence of the bar, she was not the less in fault. She ought not to have been there. She ought to have foreseen the difficulty, and guarded against it; and this fault is closely connected with another. The propeller entered the cut at too great a rate of speed. This increased the danger. It brought her to the place of greatest difficulty at the most unfavorable time for passing it, besides making her unmanageable. * * * It is thus manifest that the collision was caused by the misconduct of those in charge of the propeller." The Alleghany, 9 Wall. (76 U. S.) 522. See, also, The Daniel Drew, Case No. 3,565.]